# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | **U. S. DISTRICT COURT - DE**  **MISC. CASE #** 0 6 - 1 7 5 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHARLES RICHARD HOMA; SUNSET FINANCIAL SERVICES, LLC, C4T MANAGEMENT, INC., T/P FUNDING SERVICES, INC., MICHAEL GAUSE BILL J. SHORT, II, JIMMY B. ROOF, ROBERT C. ELLENBURG, STEVEN SHANE NICHOLS, et al. | : | Civil Action No. 99-cv-06895 Hon. Ronald A. Guzman |
| Defendants, | : | |
| and | : | |
| LINDY L. GAUSE, LINDA L. NICHOLS AND NICHOLS AND ASSOCIATES, | : | |
| Relief Defendants. | : | |

## NOTICE OF RECEIVERSHIP

NOW COMES Phillip S. Stenger, by and through his attorneys, Stenger & Stenger, P.C.,

as the Court-appointed Receiver for Caribe Air, LLC, and provides notice of his appointment as

receiver pursuant to 28 U.S.C. §754 and files with the Clerk a copy of the Complaint (attached as

**Exhibit A**) and the Order Appointing Receiver for Caribe Air, LLC (attached as **Exhibit B**).

Respectfully Submitted,
STENGER & STENGER, P.C.
Attorneys for the Receiver

Dated September 21, 2006

By: Sara E.D. Fazio (90785296)

Business Address:
4095 Embassy Drive, S.E., Ste. A
Grand Rapids, MI 49546
Telephone: (616) 940-1190

# EXHIBIT A

**Complaint**



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : |
| : | CIVIL ACTION NO. |

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION,

              Plaintiff,

v.

CHARLES RICHARD HOMA; SUNSET FINANCIAL
SERVICES, LLC, C4T MANAGEMENT, INC.,
T/P FUNDING SERVICES, INC., MICHAEL GAUSE,
BILL J. SHORT, II, JIMMY B. ROOF, ROBERT C. ELLENBURG,
STEVEN SHANE NICHOLS, CHARLES EDWARD DICKERSON,
PHILIP A. SHARPTON, BILCIN ENTERPRISES, INC.,
JIMMY B. ROOF, LLC, R. ELLENBURG, LLC,
R & E ASSOCIATES LTD. D/B/A ROOF & ELLENBURG, LLC,
SAFEHARBOR ADVISORS, INC., PAS, INC.,
PAS HOLDINGS, INC., VOLUNTEER ENTERPRISES, LTD.,
GULFCOAST HOLDINGS, LLC,
R & E LTD. D/B/A JB ROOF & ASSOCIATES, LLC,
J & R FINANCIAL SERVICES, LTD.,
J. ROOF & R. ELLENBURG, LLC,
BELLWETHER HOLDINGS, LLC,
SOUTHWESTERN HOLDINGS, LLC,
and TITLE HOLDINGS, LLC,

              Defendants.

CIVIL ACTION NO.

99 C v 10552

Judge Edelstein

---

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), for its

Complaint states as follows:

SUMMARY

1. As described in detail below, the defendants have engaged in a $314 million Ponzi scheme in which, during the last 15 months, they have raised at least $45 million from over 500 investors through six offerings of notes and bonds. The Defendants are part of a multi-level marketing scheme, in which Defendants Michael Gause ("Gause") and Richard Homa ("Homa") are at the top, with the marketers of the notes and bonds obtaining investor proceeds for use by entities affiliated with Homa and Gause.

2. Six offerings have been conducted through defendants Bellwether Holdings, LLC ("Bellwether"), Southwestern Holdings, LLC ("Southwestern"), Title Holdings, LLC ("Title Holdings"), Gulfcoast Holdings, LLC ("Gulfcoast"), R & E Ltd. d/b/a JB Roof and Associates ("JB Roof"), J & R Financial Services, Ltd. ("JR Financial"), R & E Associates, Ltd. d/b/a Roof and Ellenburg LLC ("RE #1) and J. Roof and R. Ellenburg, LLC ("RE #2") (collectively the "Issuer Defendants").

3. Defendant Steven Shane Nichols ("Nichols"), through a multi-level marketing structure he directs that includes defendants Charles Edward Dickerson ("Dickerson") and Philip A. Sharpton ("Sharpton"), and the corporate defendants they established and control, Safeharbor Advisors, Inc. ("Safeharbor"), PAS, Inc. ("PAS"), PAS Holdings, Inc. ("PASH"), and Volunteer Enterprises, Ltd. ("Volunteer"), have raised approximately $19 million through the sale of Bellwether notes and Southwestern and Title Holdings bonds. Defendants Jimmy B. Roof ("Roof") and Robert C. Ellenburg ("Ellenburg"), and the corporate defendants they established and control, Jimmy B. Roof, LLC ("JBR-

2

LLC") and R. Ellenburg, LLC ("RE-LLC"), have raised approximately $25 million

through the sale of notes issued by RE #1, JB Roof and JR Financial, as well as bonds

issued through RE #2. Defendant Bill J. Short, II, through BilCin Enterprises, Inc.

(collectively referred to as "Short"), has raised approximately $485,000 through the sale

of Gulfcoast bonds. Nichols, Sharpton, Dickerson, Roof, Ellenburg, Short, and the

entities that they control, Safeharbor, PAS, PASH, Volunteer, JBR-LLC, RE-LLC, and

BilCin, are collectively referred to in this Complaint as the "Marketer Defendants."

    4. In all six offerings investors have been told and continue to be told that

Bellwether, Southwestern, Title Holdings , RE #1, RE #2 and Gulfcoast loan the proceeds

from the sale of the notes and bonds to a company that provides capital to companies

engaged in making car title loans and check cashing and advance loans. Gause and Homa

have met together with the Marketer Defendants and investors to explain the car title

lending business. The only company identified by Gause and Homa to the Marketer and

Issuer Defendants as receiving investor funds is defendant C4T Management, Inc.

("C4T"), a company owned and operated by Homa, which makes car title loans through

its operating affiliates d/b/a Cash 4 Titles. Investors are told that the car title loan

business operates similarly to a pawn shop. People who are in need of short term loans

and have bad credit sign over the title to their cars in exchange for a 30-day loan with an

interest rate of between 22% - 25% monthly. Upon repayment of the loan, their car title

is returned to them. No check cashing and advance loan company has been identified as

receiving investor funds.

5.   However, most of the investor funds have not been used in the car title loan or check cashing and advance business. As part of the scheme to defraud, investor money has been passed through the bank accounts of defendants Sunset Financial Services, LLC. ("Sunset Financial"), which is owned and operated by Homa, and the securities account of Banc Caribe for credit to T/P Funding Services, Inc. ("T/P Funding"), which are both controlled by Homa. Sunset Financial and T/P Funding are related to defendant C4T.

6.   Homa and Gause direct and control the flow of investor proceeds through this scheme. Gause has given Marketer Defendants express instructions on where to send investor proceeds, including directing Marketer Defendants to send investor proceeds to accounts in the Cayman Islands, and at least some of the Marketer Defendants understand that Gause is responsible for directing investor proceeds into the car title lending industry. Homa controls the Sunset Financial bank account through which most of the investor funds are passed.

7.   Very little of the money raised has been transferred to C4T and used in its business. Instead, the majority of the funds have been transferred to accounts in the Cayman Islands and used, in classic Ponzi scheme fashion, to pay interest on the notes and bonds of earlier investors, and to pay the personal expenses of Homa and Gause, and compensation to the Marketer Defendants.

8.   Homa, Gause, Sunset Financial, C4T, T/P Funding, the Issuer Defendants and the Marketer Defendants, directly or indirectly, have engaged, are engaging, and are about to engage, in violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77q(a), and Section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §§78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

Additionally, the Marketer Defendants have engaged, are engaging, and are about to

engage, in violations of Sections 15(a)(1) and 15(c)(1) of the Exchange Act, 15 U.S.C. §§

78o(a)(1) and 78o(c)(1), and Rule 15c1-2 thereunder, 17 C.F.R. § 240.15c1-2.

9.    There is a reasonable likelihood that unless temporarily, preliminarily, and

permanently restrained and enjoined, Homa, Gause, Sunset Financial, C4T, T/P Funding,

the Issuer Defendants and the Marketer Defendants will continue to engage in the

transactions, acts, practices, and courses of business described below, and in similar acts,

practices, and courses of business.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to Section 20(b) of

the Securities Act, 15 U.S.C. §77t(b), Sections 21(d) and 21(e) of the Exchange Act, 15

U.S.C. §§ 77u(d) and 78u(e), to temporarily restrain, and preliminarily and permanently

enjoin Homa, Gause, Sunset Financial, C4T, T/P Funding, the Issuer Defendants and the

Marketer Defendants from future violations of the federal securities laws.  The

Commission also seeks from Defendants disgorgement of ill-gotten gains plus

prejudgment interest, an asset freeze, repatriation of overseas funds to the United States,

an accounting, an order prohibiting the destruction of books and records. the appointment

of a receiver and such other equitable relief that may be deemed appropriate.  In addition,

the Commission seeks civil penalties pursuant to Section 20(d) of the Securities Act, 15

U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

11.    Homa, Gause, Sunset Financial, C4T, T/P Funding, the Issuer Defendants and the Marketer Defendants, directly and indirectly, singly and in concert, have made and are making, use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

12.    The transactions, acts, practices and courses of business constituting the violations herein have occurred within the jurisdiction of the Southern District of New York and elsewhere.

## DEFENDANTS

13.    **Michael Gause** is a resident of Ft. Lauderdale, Florida. Gause is at the top level of a multi-level marketing program that raises investor funds for C4T. Gause directs the transfer of funds raised by the Marketer Defendants through various U.S. and offshore bank accounts.

14.    **Charles Richard Homa,** age 50, is a resident of Atlanta, Georgia, and is the owner of C4T and its operating affiliates, and co-owner of Sunset Financial. Homa controls C4T, Sunset Financial, and T/P Funding. Homa is also the Chairman and part owner of Banc Caribe Ltd., an offshore private bank located on the island of Dominica in the Caribbean.

15.    **C4T Management, Inc.** is a Florida company incorporated in September 1995. C4T manages the approximately 150 store front loan operations that provide car title loans to consumers under the name Cash 4 Titles.

16.    **Sunset Financial Services, LLC** is a Florida limited liability company incorporated in February 1998. Sunset Financial was established to provide funds, through C4T, to the Cash 4 Titles operating affiliates. Homa co-owns Sunset Financial with Elizabeth Vitullo.

17.    **T/P Funding Services, Inc.** is a Florida company incorporated in July 1999. T/P Funding was created to make loans to companies in the car title and check cashing and advance loan business. The registered agent for T/P Funding is also the registered agent for C4T and Sunset Financial. T/P Funding shares the same address as C4T and Sunset Financial.

### The Marketer Defendants

18.    **Steven Shane Nichols and Safeharbor Advisors, Inc.:** Nichols, age 46, is a resident of Aurora, Colorado. Nichols is the Managing Director of Bellwether Holdings, LLC ("Bellwether"), Southwestern Holdings, LLC ("Southwestern"), and Title Holdings, LLC ("Title Holdings"), and the only owner, officer and director of Safeharbor. Safeharbor Advisors, Inc. ("Safeharbor") is a Colorado corporation originally incorporated as SSN, Inc. in June 1996. Safeharbor owns 20% of Bellwether, 9.09% of Southwestern and 10% of Title Holdings. Safeharbor has received at least $650,762 in marketing compensation from Bellwether and at least $112,697 from Southwestern. Nichols and Safeharbor are not registered with the Commission as brokers or dealers.

19.    **Philip A. Sharpton, PAS, Inc., and PAS Holdings, Inc. :** Sharpton, age 57, is a resident of Stone Mountain, Georgia. PAS, Inc. ("PAS"), a Georgia corporation, was formed in December 1989 by Sharpton. PAS is a 20% owner of Bellwether. PAS

has received at least $991,000 in marketing compensation from Bellwether. PASH,

Holdings, Inc. ("PASH") is a Georgia corporation formed in August 1998 by Sharpton.

PASH owns 9.09% of Southwestern and 10% of Title Holdings. PASH received at least

$135,600 in marketing compensation from Southwestern. Sharpton, PAS and PASH are

not registered with the Commission as brokers or dealers.

     20.    **Charles Edward Dickerson and Volunteer Enterprises, Ltd. :**

Dickerson, age 52, is a resident of Franklin, Tennessee. Nichols and Sharpton are down-

line marketers from Dickerson, who receives a .5% monthly commission on all funds raised

in the Bellwether and Southwestern Offerings. Dickerson is the owner of Volunteer.

Volunteer is a Nevada corporation formed in January 1998. Volunteer owns 20% of

Bellwether and 9.09% of Southwestern. Volunteer received at least $372,540 in marketing

compensation from Bellwether and at least $51,100 from Southwestern. Dickerson and

Volunteer are not registered with the Commission as brokers or dealers.

     21.    **Jimmy B. Roof and Jimmy B. Roof, LLC:** Roof, age 61, resides in

West Columbia, South Carolina. JBR-LLC is a limited liability company owned by Roof

to raise money for companies in the car title lending industry. Roof and JBR-LLC are not

registered with the Commission as brokers or dealers.

     22.    **Robert C. Ellenburg and R. Ellenburg, LLC:** Ellenburg, age 61, resides

in Columbia, South Carolina. RE-LLC is a limited liability company owned by

Ellenburg to raise money for companies in the car title lending industry. Ellenburg and

RE-LLC are not registered with the Commission as brokers or dealers.

23.    **Bill J. Short, II and BilCin Enterprises, Inc.:** Short, age 33, is a resident of Marco Island, Florida. He owns 14.29% of Gulfcoast through his company, BilCin Enterprises, Inc. ("BilCin"). Short is the managing director of Gulfcoast. BilCin is a Florida corporation that Short formed in March 1999. Before the Gulfcoast Offering, Short raised funds for Sunset Financial through Seajay Capital, Inc. ("Seajay"). Seajay is a Florida corporation that was formed in August 1998. Short and BilCin are not registered with the Commission as brokers or dealers.

### The Issuer Defendants

24.    **Bellwether Holdings, LLC** is a Colorado limited liability company incorporated in February 1998. Bellwether was created to consolidate monies for the car title loan industry. Nichols is the Managing Director of Bellwether.

25.    **Southwestern Holdings, LLC** is a Nevada limited liability company incorporated in August 1998. Southwestern Holdings was created to raise funds for companies that make car title and check cashing and advance loans. Nichols is the Managing Director of Southwestern. Southwestern has twelve owners which include all five Bellwether owners.

26.    **Title Holdings, LLC** is a Nevada limited liability company incorporated in March 1999. Title Holdings was created to raise funds for companies that make car title and check cashing and advance loans. Nichols is the Managing Director of Title Holdings. Six of the owners of Southwestern are also owners of Title Holdings.

27.    **R & E Associates, LLC d/b/a Roof and Ellenburg LLC ("RE #1")** is a Nevada limited liability company. RE #1 was created by Roof and Ellenburg to raise money for companies in the car title lending industry.

28.    **R & E Ltd. d/b/a JB Roof and Associates ("JB Roof")** is a Nevada limited liability company owned by Jimmy B. Roof. JB Roof is a co-owner of RE #1. JB Roof was created by Roof to raise money for companies in the car title lending industry.

29.    **J & R Financial Services, Ltd. ("JR Financial")** is a Nevada limited liability company owned by Robert Ellenburg. JR Financial is a co-owner of RE #1. JR Financial was created by Ellenburg to raise money for companies in the car title lending industry.

30.    **J. Roof and R. Ellenburg, LLC ("RE #2")** is a South Carolina limited liability company incorporated in July 1999. Roof and Ellenburg, through their companies JBR-LLC and RE-LLC, each own 50% of RE #2. RE #2 was created by Roof and Ellenburg to raise money for companies in the car title and check cashing and advance business.

31.    **Gulfcoast Holdings, LLC** is a Delaware limited liability company incorporated in March 1999. Short, through BilCin, owns 14.29% of Gulfcoast. Gulfcoast raises funds for use in the car title loan and check cashing and advance business.

## THE OFFERINGS

### THE BELLWETHER OFFERING

32.     From April 1998 to June 1999, Bellwether raised at least $11 million through the sale of notes to at least 136 investors in 17 states. Bellwether sold 270-day notes, which pay interest of 2.25% per month (27% per year).

33.     Bellwether's offering document represented to investors that the funds raised through the sale of the notes would be invested in the car title lending industry. Although the offering document did not identify the company to which investor funds would be loaned, at least some of the Bellwether owners knew that the money would go to C4T. In certain instances, Bellwether owners arranged for potential investors to meet with Homa to learn about the car title loan industry and how the funds raised in the Bellwether offering purportedly were invested.

34.     At Gause's direction, the Bellwether owners wired money (and had investors wire money) to a Bank of Bermuda account at Citibank in New York City for further credit to an account in the Cayman Islands. Nichols and other Bellwether owners understood that Gause controlled the funds in the Cayman Islands, although Nichols also had authority to transfer funds into and out of the Cayman Islands account.

35.     Since April 1998, Bellwether has paid investors at least $5.5 million in interest and the Bellwether owners have received at least $2.4 million in compensation. Bellwether has paid marketing compensation to Bellwether owners in the following

amounts: Safeharbor has received at least $650,762; PAS has received at least $991,009
and Volunteer has received at least $372,540.

THE SOUTHWESTERN OFFERING

36.    In December 1998, Southwestern began a $10 million dollar offering
which, through June 1999, had raised at least $8 million. Southwestern has sold bonds to
at least 86 investors in at least 13 states  According to the Southwestern offering
document, returns on the Southwestern seven-year bonds are determined by the amount
of the principal investment and range between 1.25% - 2.25% per month (15% - 27%
annually).

37.    Southwestern's offering documents state that investor funds will be used
to loan money to a company that will, in turn, lend the money to companies in the car
title and check cashing an  advance business. In addition, the Southwestern Offering
documents indicate that investor returns will be generated by car title loans and check
cashing and advance loans. Further, Southwestern's offering documents also state that
Southwestern has obtained a security interest in the accounts receivable of the company
to which investor funds will be loaned and an exhibit to the offering document identifies
Sunset Financial as the recipient of the funds. Additionally, in November 1998,
Southwestern received a security agreement and UCC-1 form pledging all of its accounts
receivable to Southwestern as collateral for a promissory note in the amount of $10
million.

38.    The Southwestern owners have directed investor proceeds from a
Southwestern U.S. bank account at Norwest Bank (located in Denver, Colorado) to

Sunset Financial's U.S. account at First Union Bank (located in Florida). Sunset

Financial then directed some investor proceeds through a bank in New York City for

further credit to bank accounts in the Cayman Islands.

39.    Since December 1998, Southwestern has paid investors at least $957,000

in interest and Southwestern's owners have received at least $492,500 in compensation.

Southwestern has paid marketing compensation to certain Southwestern owners in the

following amounts: Safeharbor has received at least $112,697; PASH has received at

least $135,679; and Volunteer has received at least $51,101.

### THE TITLE HOLDINGS OFFERING

40.    In or about May or June 1999, Title Holdings began a $10 million bond

offering. According to a Form D Notice of Sale of Securities filed by Title Holdings in

May 1999, Title Holdings has raised $300,000 through the sale of high interest seven-

year bonds. According to the Title Holdings offering document, returns on the seven-

year bonds are determined by the amount of the principal investment and range between

1.25% - 2.25% per month (15% - 27% annually).

41.    Title Holdings' offering documents state that investor funds will be used

to loan money to a company that will, in turn, lend the money to companies in the car

title and check cashing and advance business. In addition, the Title Holdings offering

documents indicate that investor returns will be generated by car title loans and check

cashing and advance loans. Further, Title Holdings' offering documents also state that

Title Holdings has obtained a security interest in the accounts receivable of the company

to which investor funds will be loaned and an exhibit to the offering document identifies

Sunset Financial as the recipient of the funds. Sunset Financial executed a security agreement and UCC-1 form pledging all of its accounts receivable to Title Holdings as collateral for a promissory note in the amount of $10 million. At least some investors were told by Nichols that money raised by Title Holdings would be loaned to C4T.

42.     Nichols directed investor proceeds from the Title Holdings Offering from Title Holdings' account at Norwest Bank to Sunset Financial's U.S. account at First Union Bank. Sunset Financial's bank account records reflect that Sunset Financial directs some Title Holdings investor proceeds to a bank in New York City, for further credit to bank accounts in the Cayman Islands.

THE ROOF AND ELLENBURG OFFERINGS

43. Prior to initiating the RE#1 Offering, Roof and Ellenburg, under Gause's direction, had raised funds for C4T by selling notes (the "Gause Offering"). The Gause Offering was refunded after C4T received regulatory inquiries.

### The RE #1 Offering

44. In 1997, Roof and Ellenburg began the RE #1 Offering through JB Roof and JR Financial. In this offering, RE #1, along with JB Roof and JR Financial, issued and sold 270-day promissory notes, which provided for a return of between 1% and 3% per month, which is the same return given to Roof's and Ellenburg's investors in the Gause Offering. From 1997 until February 1999, Roof and Ellenburg raised at least $23 million in investor funds from at least 323 investors through the RE #1 Offering. Approximately 90% of Roof's and Ellenburg's investors in the Gause Offering rolled their funds into the RE #1 Offering. Roof and Ellenburg agreed to end the RE #1 Offering after the

Securities Division of the Attorney General's Office of the State of South Carolina contacted Roof and Ellenburg about the offering.

45.    In at least one document prepared in connection with the RE #1 Offering, the car title lending industry is the only revenue generating business discussed as a recipient of investor funds.

46.    Gause told Ellenburg to direct proceeds from this offering through a bank in New York City for further credit to Cayman Island accounts in the name of JIBO Limited ("JIBO").

### The RE #2 Offering

47.    In July 1999, Roof and Ellenburg began selling three-year bonds that bear interest rates ranging from 1% to 3% per month through RE #2. Roof and Ellenburg have raised at least $5.3 million in this offering. This offering is currently ongoing.

48.    In the RE #2 offering documents, Roof and Ellenburg represent to investors that proceeds from the offering will be forwarded to a company which will, in turn, loan investor proceeds to companies engaged in making car title loans and check cashing and advance loans.    Further, the offering documents also state that RE #2 has obtained a security interest in the accounts receivable of the company to which investor funds will be loaned and an exhibit to the offering document identifies T/P Funding as the recipient of the funds. Ellenburg testified that Gause told him to send investor proceeds from the RE #2 Offering to T/P Funding.  T/P Funding executed a security agreement and UCC-1 form for RE #2 pledging all of its accounts receivable to RE #2 as collateral for a promissory note in the maximum amount of $50 million.

49.    On or about August 18, 1999, through a series of transactions, Roof and Ellenburg transferred the $5.3 million raised in the RE #2 Offering to T/P Funding. Roof and Ellenburg first directed that the funds be transferred to a Dain Rauscher bank account for credit to a Banc Caribe securities account at Dain Rauscher. They then directed that the funds deposited in the Banc Caribe securities account be credited to T/P Funding.

50.    It does not appear, however, that T/P Funding has loaned investor funds to the any car title or check cashing and advance business. After the funds were transferred to the Banc Caribe securities account at Dain Rauscher, $2 million was transferred through New York City to a Cayman Island account and the rest of the funds remain in the Banc Caribe securities account at Dain Rauscher and have not been invested in the car title or check cashing and advance business.

## THE GULFCOAST OFFERING

51.    In April 1999, Short, through Gulfcoast, began a $10 million offering of seven-year bonds with an interest rate of 2% per month. From April 1999 through June 1999, Gulfcoast raised at least $485,000 in investor funds.

52.    Gulfcoast's offering documents state that investor funds will be used to loan money to a company that will, in turn, lend the money to companies in the car title and check cashing and advance business. In addition, the Gulfcoast offering documents indicate that returns will be generated by car title loans and check cashing and advance loans. Further, Gulfcoast's offering documents also state that Gulfcoast has obtained a security interest in the accounts receivable of the company to which investor funds will be loaned and an exhibit to the offering document identifies Sunset Financial as the

recipient of the funds. Sunset Financial executed a security agreement and UCC-1 form pledging all of its accounts receivable to Gulfcoast as collateral for a promissory note in the amount of $10 million.

53.    Short controls Gulfcoast's bank account. Gulfcoast has wire transferred investor proceeds to Sunset Financial's account at First Union Bank. Sunset Financial then wired at least a portion of investor proceeds through a bank in New York City, to accounts in the Cayman Islands.

54.    Prior to the Gulfcoast offering, Short had raised funds for Sunset Financial through Seajay. Between September 1998 and March 1999, Seajay issued, offered and sold at least $470,000 in one-year notes. The notes paid investors 1.75% interest per month (21% per year). Short told investors in the Seajay offering that investor proceeds would be directed to the car title lending industry. Seajay wired the funds it raised to a bank account in the Cayman Islands. In April 1999, after being contacted by the staff of the Commission, all of the principal was returned to Seajay investors. Immediately afterward, Short began the same offering through Gulfcoast and many Seajay investors rolled their money into Gulfcoast.

## THE PONZI SCHEME

55.    The Defendants are operating a Ponzi scheme. They have raised at least $45 million in investor proceeds from 1997 through June 1999. Although C4T is the only car title loan company that Gause and Homa have told Marketer and Issuer Defendants will receive investor proceeds, C4T received only around $1 million from

Sunset Financial from May 1998 through June 1999. C4T received no money from T/P Funding during this time period.

56.    The Defendants generally direct money to Cayman Island bank accounts through certain banks in New York City. Wire transfers are made, at the direction of the Defendants, to a New York City bank, with further credit to a Cayman Island bank account. Similarly, when money raised through the scheme is directed back to a U.S. bank account from a Cayman Island account, the money is generally sent through a bank in New York City.

57.    From May 1998 through June 1999, approximately $102 million passed through Sunset Financial's U.S. bank account. None of the $102 million came from C4T. Of this money, Sunset Financial sent more than $68 million to Cayman Island accounts, approximately $1 million to C4T, and the remaining money was used to pay Gause and Homa's personal expenses and business expenses unrelated to C4T, to make interest payments to Bellwether, Southwestern, Title Holdings and Gulfcoast investors, and to pay compensation to Marketer Defendants.

58.    Specifically, from May 1998 through June 1999, Sunset Financial transferred approximately $6.5 million to Bellwether, Southwestern, Title Holdings and Gulfcoast, which was used to pay interest on investor notes and bonds and approximately $3 million of which was used to pay marketing compensation to Nichols, Sharpton, Dickerson, Short and other marketers of these Offerings.

59.    Further, approximately $24 million was used to pay Homa's personal expenses and fund businesses, unrelated to Sunset Financial, T/P Funding or C4T and its operating affiliates, in which Homa and/or Gause has an interest.

60.    Moreover, from May 1998 through June 1999, C4T never transferred any funds to Sunset Financial, and thus could not have been the source of funds used to pay interest on investor notes and bonds. Further, C4T's bank records establish that the operating affiliates did not generate significant revenues between May 1998 and June 1999, and thus could not have generated the money used to pay interest on investor notes and bonds.

## MISREPRESENTATIONS AND OMISSIONS TO INVESTORS BY THE DEFENDANTS

61.    Homa, Gause, Sunset Financial, C4T, T/P Funding, the Marketer Defendants and the Issuer Defendants have made and continue to make several misrepresentations and omissions of fact to investors in connection with the offer, purchase and sale of the Bellwether, JB Roof, RE #1 and JR Financial notes and Southwestern, Title Holdings, RE #2, and Gulfcoast bonds.

62.    Homa, and through him, Sunset Financial and C4T have made and continue to make misrepresentations about the use of investor proceeds. In personal meetings with investors and by pledging Sunset Financial's accounts receivable and executing a promissory note to secure the Southwestern, Gulfcoast and Title Holdings Offerings, Homa represented that investor funds would be used by C4T through its operating affiliates to make car title loans to consumers. In actuality, Homa, Sunset

Financial and C4T know that at most $1 million of the $45 million raised by the defendants was forwarded to C4T for use in its business.

63.     Homa, and through him, Sunset Financial and C4T have and continue to create the impression that C4T, or the car title lending business, is the source of funds for interest payments to investors. Homa, as President of C4T, knows that C4T's operating affiliates are not generating revenues sufficient to pay the interest on the Issuer Defendants' notes and bonds and has failed to inform investors of this fact. Further, Homa knows that the source of funds for interest payments to investors are other investor funds and has failed to inform investors of this fact.

64.     Homa, and through him, Sunset Financial and C4T, have made and continue to make misrepresentations about the sufficiency of Sunset Financial's accounts receivable pledged as security for the Southwestern, Gulfcoast and Title Holdings Offerings. Sunset Financial has no business other than lending money to C4T for use in the car title loan industry. Sunset Financial has only $1 million in accounts receivable based on its loan of such money to C4T. Moreover, Sunset Financial does not have the assets to pay the promissory notes given to Southwestern, Gulfcoast and Title Holdings. Thus, Homa knows and has failed to inform investors that the promissory notes given and the accounts receivable pledged by Sunset Financial were inadequate security for the $19.8 million loaned to it by Southwestern, Title Holdings and Gulfcoast.

65.     T/P Funding has made and continues to make misrepresentations about the sufficiency of its accounts receivable pledged as security for the RE #2 Offering. T/P Funding has no business other than lending money to C4T for use in the car title loan

industry. T/P Funding has not directed investor proceeds to C4T to be used in the car title lending industry. Accordingly, T/P Funding has no accounts receivable based on its loan of such money to C4T. Moreover, T/P Funding does not have the assets to pay the promissory note given to RE #2. Thus, T/P Funding knows and has failed to inform investors that the promissory notes given and accounts receivable pledged by T/P Funding did not adequately secure the RE #2 Offering.

66.    Gause has made and continues to make misrepresentations concerning the use of investor proceeds and the source of funds for interest payments to investors. Gause has told and continues to tell Marketer and Issuer Defendants and investors that C4T uses investor proceeds in its car title loan business, even though he knows that only a small fraction of investor proceeds are directed to C4T. Gause has also told Marketer and Issuer Defendants and investors that C4T's car title loan operations are the source of the return to investors, even though he knows that C4T is not generating the money that is used to make payments to investors.

67.    The Marketer Defendants and the Issuer Defendants have made the same misrepresentations and omissions as Homa, Sunset Financial, T/P Funding and C4T. As marketers and issuers of the notes and bonds, these defendants either obtained reliable financial information and loan schedules reflecting the use of investor funds by C4T and its operating affiliates from Sunset Financial, T/P Funding or C4T and knew that the information they have given and continue to give to investors is false, or had an insufficient basis to tell investors that the proceeds of the notes and bonds would be used to fund car title loans and check cashing and advance loans and that the loans would

generate the promised interest payments on the notes and bonds.  Further, the Marketer Defendants and Issuer Defendants who offered and sold the Southwestern, Gulfcoast, Title Holdings and RE #2 bonds either knew that the promissory notes given and accounts receivable pledged by Sunset Financial and T/P Funding did not adequately secure the offerings or had an insufficient basis to create the impression to investors that the promissory notes and receivables were adequate security.

### THE MARKETER DEFENDANTS OPERATED AS
### UNREGISTERED BROKER-DEALERS

68.    The Marketer Defendants offered and sold the Bellwether, RE #1, JB Roof and JR Financial notes and Southwestern, Title Holdings, RE #2, and Gulfcoast bonds to investors as described above.

69.    The Marketer Defendants received compensation in the form of commissions based upon their sales of the Bellwether, RE #1, JB Roof and JR Financial notes and Southwestern, Title Holdings, RE #2  and Gulfcoast bonds.

70.    At the time the Marketer Defendants offered and sold the Bellwether, RE #1, JB Roof and JR Financial notes and Southwestern, Title Holdings, RE #2 and Gulfcoast bonds they were not registered with the Commission as broker-dealers and had not obtained the necessary regulatory approval to sell securities as properly licensed associated persons of registered broker-dealers.

COUNT I
Violations of Section 17(a)(1) of the Securities Act
[15 U.S.C. §77q(a)(1)]

71.    Paragraphs 1 through 70 are hereby realleged and incorporated by reference herein.

22

72.    At the times alleged in this Complaint, Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants, in the offer and sale of securities in the form of notes and bonds, by the use of the means and instruments of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly, have employed and are employing devices, schemes and artifices to defraud, all as more fully described in Paragraphs 1 through 70 above.

73.    As part of the scheme to defraud, Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants have made and are making false and misleading statements of material fact have omitted and are omitting to state material facts to investors and prospective investors concerning the use of investor proceeds, the source of investor interest payments, and the sufficiency of the account receivables pledged and promissory notes given by Sunset Financial and T/P Funding as security for the offerings, as more fully described in Paragraphs 1 through 70 above.

74.    Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants knew or were reckless in not knowing the facts and circumstances described in Paragraphs 71 through 73 above.

75.    By reason of the activities described in Paragraphs 71 through 74 above, Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants have violated and are violating Section 17(a)(1) of the Securities Act [15 U.S.C. 77q(a)(1)].

COUNT II
Violations of Section 17(a)(2) and 17(a)(3)
of the Securities Act
[15 U.S.C. §77q(a)(2) and 77q(a)(3)]

76.    Paragraphs 1 through 70 are hereby realleged and incorporated by reference herein.

77.    At the times alleged in this Complaint, Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants in the offer and sale of securities in the form of notes and bonds, by the use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, have obtained and are obtaining money and property by means of untrue statements of material facts and have omitted and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in transactions, practices and courses of business which operated and will operate as a fraud and deceit upon purchasers and prospective purchasers of the securities, all as more fully described in Paragraphs 1 through 70 above.

78.    By reason of the activities described in Paragraphs 76 and 77 above, Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants have violated and are violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§77q(a)(2) and 77q(a)(3)].

COUNT III
Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]
and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder

79.    Paragraphs 1 through 70 are hereby realleged and incorporated by reference herein.

80.    At the times alleged in this Complaint, Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants in connection with the purchase and sale of securities in the form of notes and bonds, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, have employed and are employing devices, schemes and artifices to defraud; have made and are making untrue statements of material fact and have omitted and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in acts, practices and courses of business which operated and will operate as a fraud and deceit upon purchasers and sellers of such securities, all as more fully described in Paragraphs 1 through 70 above.

81.    Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants knew or were reckless in not knowing of the activities described in Paragraphs 79 through 80 above.

82.    By reason of the activities described in Paragraphs 79 through 81 above, Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the

25

Issuer Defendants have violated and are violating Section 10(b) of the Exchange Act [15 U.S.C. §78j (b)] and Rule 10b-5 [17 C.F.R.§240.10b-5] thereunder.

COUNT IV
Violations of Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)]

83.     Paragraphs 1 through 70 are hereby realleged and incorporated by reference herein.

84.     At the times alleged in this Complaint, the Marketer Defendants have been and are in the business of effecting transactions in securities for the accounts of others, as more fully described in Paragraphs 68 through 70 above.

85.     The Marketer Defendants have made and are making use of the mails and of the means and instrumentalities of interstate commerce to effect transactions in and to induce or attempt to induce the purchase of securities, as more fully described in Paragraphs 68 through 70 above.

86.     At the times alleged in this Complaint, none of the Marketer Defendants was registered with the Commission as a broker or dealer, as required by Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)], as more fully described in Paragraphs 68 through 70 above.

87.     By reason of the activities described in Paragraphs 83 through 86 above, the Marketer Defendants have violated and are violating Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)].

COUNT V
Violations of Section 15(c) of the Exchange Act [15 U.S.C. §78o(c)]
and Rule 15c1-2 thereunder [17 C.F.R. 240.15c1-2]

88.     Paragraphs 1 through 70 are hereby realleged and incorporated by reference herein.

89.     At the times alleged in this Complaint, none of the Marketer Defendants was registered with the Commission as a broker or dealer, as more fully described in Paragraphs 68 through 70 above.

90.     At the times alleged in this Complaint, the Marketer Defendants, acting as brokers, have and are making use of the mails and instrumentalities of interstate commerce, and have induced and are attempting to induce the purchase and sale of securities, otherwise than on a national securities exchange of which it was a member, by means of manipulative, deceptive and fraudulent devices and contrivances, as more fully described in Paragraphs 1 through 70 above.

91.     The Marketer Defendants knew, or were reckless in not knowing, of the activities described in Paragraph 90 above.

92.     By reason of the activities described in Paragraphs 88 through 91 above, the Marketer Defendants violated and are violating Section 15(c) of the Exchange Act [15 U.S.C. §78o(c)] and Rule 15c1-2 thereunder [17 C.F.R. 240.15c1-2].

RELIEF REQUESTED

WHEREFORE, the Plaintiff respectfully requests that the Court:

I.

Find that Homa, Gause, Sunset Financial, T/P Funding, C4T, the

Marketer Defendants and the Issuer Defendants committed the violations alleged above.

II.

Grant a Temporary Restraining Order and Orders of Preliminary and Permanent

Injunction, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure,

restraining and enjoining Homa, Gause, Sunset Financial, T/P Funding, C4T, the

Marketer Defendants and the Issuer Defendants, their officers, agents, servants,

employees, attorneys, and those persons in active concert or participation with them who

receive actual notice of the Temporary Restraining Order, the Order of Preliminary

Injunction and the Order of Permanent Injunction by personal service or otherwise, and

each of them, from directly or indirectly, engaging in the acts, practices or courses of

business described above, or in conduct of similar purport and object, in violation of

Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act, 77q(a)(1), 77q(a)(2) and

77q(a)(3), Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5

thereunder, 17 C.F.R. 240.10b-5.

Additionally, Grant a Temporary Restraining Order and Orders of Preliminary

and Permanent Injunction, in forms consistent with Rule 65(d) of the Federal Rules of

Civil Procedure, restraining and enjoining the Marketer Defendants, their officers, agents,

servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the Temporary Restraining Order, the Order of Preliminary Injunction and the Order of Permanent Injunction by personal service or otherwise, and each of them, from directly or indirectly, engaging in the acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 15(a)(1) and 15(c)(1) of the Exchange Act, 15 U.S.C. §§ 78o(a)(1) and 78o(c)(1), and Rule 15c1-2 thereunder, 17 C.F.R. § 240.15c1-2.

### III.

Enter an Order restraining and enjoining, Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the Issuer Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the Temporary Restraining Order, the Order of Preliminary Injunction and the Order of Permanent Injunction by personal service or otherwise, and each of them, from directly or indirectly:

A.    transferring, selling, assigning, pledging, dissipating, concealing or otherwise disposing of in any manner, any funds, assets, or other property belonging to, or in the possession, custody or control of the Defendants, wherever located; and

B.    destroying, mutilating, concealing, altering or disposing of in any manner, any of the books, records, documents, correspondence, brochures, manuals, obligations or other property of or pertaining to the offer and sale of Bellwether, JB Roof, JR Financial and RE #1 notes, Southwestern, Title Holdings, RE #2 and Gulfcoast bonds, and Sunset Financial, T/P Funding and C4T financial and operating information, wherever located.

C.       provide to the Court, within four days of issuance of the

Temporary Restraining Order, an accounting of all funds received from

investors in connection with the notes or bonds sold by Homa, Gause,

Sunset Financial, T/P Funding, C4T, the Marketer Defendants and the

Issuer Defendants, the uses to which such investor funds were put and the

amounts of any remaining such funds and their location, and an

accounting of any remaining assets of the Defendants, and their location;

provided, however, that nothing in the Order shall be construed to require

Homa, Gause, Sunset Financial, T/P Funding, C4T, the Marketer

Defendants and the Issuer Defendants to abandon any constitutional or

other legal privilege which they may have available to them.

VI.

Grant an Order requiring Homa, Gause, Sunset Financial, T/P Funding, C4T, the

Marketer Defendants and the Issuer Defendants to disgorge any and all ill-gotten gains

(including prejudgment interest).

VII.

Impose civil penalties against Homa, Gause, Sunset Financial, T/P Funding, C4T

and the Marketer Defendants in accordance with Section 20(d) of the Securities Act and

Section 21(d)(3) of the Exchange Act.

VIII.

Order the appointment of a receiver for Sunset Financial, T/P Funding, C4T,

BilCin, Safeharbor, PAS, PASH, Volunteer, JBR-LLC, RE-LLC, and the Issuer

Defendants, for the benefit of investors, to marshal, conserve, protect and hold funds and assets obtained by the Defendants and their officers, agents, servants, employees, and those persons in active concert or participation in the fraudulent scheme, wherever such assets may be found, or, with the approval of the Court, dispose of any wasting asset in accordance with an application and order by the Court.

IX.

Order that the parties may commence discovery immediately, and that notice periods be shortened to permit the parties to require the production of documents, or the deposition of any party or party-representative, on 72 hours notice.

X.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

XI.

Grant Orders for such further relief as the Court may deem appropriate.

Respectfully submitted,

Robert B. Blackburn (R B 1545)
Securities and Exchange Commission
7 World Trade Center
New York, New York 10048
Telephone: 212/748-8000

OF COUNSEL
Jane E. Jarcho
John J. Sikora
Amy S. Cotter
David J. Medow
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
500 West Madison Street
Suite 1400
Chicago, IL 60661
312-353-7390 (telephone)
312-353-7398 (fax)

Dated: October 14, 1999

## EXHIBIT B

**Order Re-Appointing Receiver for Caribe Air LLC**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| Plaintiff, | : | |
| v. | : | |
| CHARLES RICHARD HOMA; SUNSET FINANCIAL SERVICES, LLC, C4T MANAGEMENT, INC., T/P FUNDING SERVICES, INC., MICHAEL GAUSE BILL J. SHORT, II, JIMMY B. ROOF, ROBERT C. ELLENBURG, STEVEN SHANE NICHOLS, CHARLES EDWARD DICKERSON, PHILIP A. SHARPTON, BILCIN ENTERPRISES, INC., JIMMY B. ROOF, LLC, R. ELLENBURG, LLC, Et al., | : | Civil Action No. 99-cv-06895 Hon. Ronald A. Guzman |
| Defendants, | : | |
| and LINDY L. GAUSE, LINDA L. NICHOLS AND NICHOLS AND ASSOCIATES, | : | |
| Relief Defendants. | : | |

## ORDER APPOINTING RECEIVER FOR CARIBE AIR, LLC

This cause coming to be heard on the Receiver's Motion and Memorandum Seeking Appointment of Phillip S. Stenger as Receiver for Caribe Air, LLC (the "Motion"), and Plaintiff, Securities and Exchange Commission, by and through its counsel, and Paul M. Jones, by and through his counsel, both having consented to the appointment of Phillip S. Stenger as receiver for Caribe Air, LLC, and the Court having considered the arguments before it,

**IT IS HEREBY ORDERED** that Phillip S. Stenger is appointed Receiver for the Receivership Property, as that term is defined herein, for the benefit of investors to marshal, conserve, protect, hold funds, operate and, with the approval of the Court, dispose of any assets

00088460.DOC

constituting the Receivership Property. The Receivership Property shall include all assets of any nature, wherever those assets may be located, of Caribe Air, LLC ("Caribe Air").

**IT IS FURTHER ORDERED** that the Receiver shall have the following powers and duties to fulfill his obligations:

1.    Oversee the operations of the corporate Receivership Property;

2.    Use reasonable efforts to determine the nature, location and value of all assets and property owned by or in the possession of Caribe Air, and its co-owners, Paul M Jones and David Pollock, and the Receivership Property;

3.    Engage and employ the law firm of Stenger & Stenger, P.C., and, with the approval of the Court, any individuals or entities the Receiver deems necessary to assist in his duties ("Retained Personnel");

4.    Take such action as necessary and appropriate to prevent the dissipation or concealment of any funds and assets or for the preservation of any such funds and assets of the Receivership Property including, but not limited to, any steps necessary to procure the voting shares of Caribe Air;

5.    The Receiver shall have the authority to issue subpoenas to compel testimony of persons or production of records in a manner consistent with the Federal Rules of Civil Procedure and the Rules of the Court concerning any subject matter relating to the identification, preservation, collection or liquidation of assets of the Receivership Property; and

6.    The Receiver may bring such legal actions based on law or equity in any state, federal or foreign court as he deems necessary or appropriate in discharging his duties as Receiver on behalf of the estate or on behalf of investors whose interests he is protecting;

7.      The Receiver is entitled, along with any Retained Personnel, to reasonable compensation and expense reimbursement from the Receivership Property.  Such compensation shall be in amounts commensurate with the services performed by the Receiver and Retained Personnel and shall be subject to the approval of the Court.  The Receiver and Retained Personnel shall apply to the Court for such compensation and expense reimbursement.

8.      The Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary duties and obligations in this matter unless and until this court so orders.

9.      The Receiver and his Retained Personnel are entitled to rely on all outstanding rules of law and court orders and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree, including those issued or passed in foreign jurisdictions.  In no event shall the Receiver or his Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or counsel for the Receiver, nor shall the Receiver or his Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that he or they acted or failed to act as a result of misfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

10.     The Receiver shall establish a bank account at Fifth Third Bank in Grand Rapids, Michigan, in the name of Phillip S. Stenger, Receiver for Caribe Air.  That account shall be frozen and remain frozen until further order of this Court and shall be established for the purpose of receiving and holdings funds and assets marshaled from the Receivership Property.

11.     Plaintiff, Caribe Air, Paul M. Jones, David Pollock and their attorneys and

employees are required to assist the Receiver in fulfilling his obligations and duties. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

12.    From time to time upon the application of the Receiver, the Court shall reissue this Order and upon application of the Receiver may amend this Order.

Dated: September _2 0_, 2006.

Honorable Ronald A. Guzman
United States District Court

4